Per Curiam :
This case was referred to Trial Commissioner Mastín Gr. White with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Buie 134(h). The commissioner has done so in an opinion and report filed on April 29,1971. Exceptions to the commissioner’s opinion, findings of fact and recommended conclusion of law were filed by plaintiffs, an excep *727 tion to the recommended conclusion of law was filed by defendant and tbe case bas been submitted to the court on oral argument of counsel and the briefs of the parties.
With respect to their major contention that Public Law 85-580, 42 U.S.C. § 267 (c), directs the additional compensation they seek, plaintiffs rely heavily on post-enactment statements by interested members of the House of Representatives which can be understood as construing the statute in the same way as plaintiffs do. The court cannot, however, place much reliance on these statements both because they came after the passage of the legislation and also, and even more importantly, because there is no showing whatever that the Senate shared these views in any measure. The indications are, rather, that the Senate accepted the proposal on its own terms. As Commissioner White points out, that statutory language, repeatedly referring to “overtime”, does not support plaintiffs’ claim if “overtime” is understood in its normal and usual sense.
Since the court agrees with the commissioner’s opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same, together with the foregoing paragraph, as the basis for its judgment in this case.* Therefore, plaintiff Harold C. Hurt (48) is not entitled to recover and the petition as to him is dismissed.
OPINION OP COMMISSIONER.
White, Commissioner: The plaintiffs are 99 Quarantine Inspectors employed by the Foreign Quarantine Division of the United States Public Health Service, Department of Health, Education, and Welfare, and stationed at various places where persons arrive in the United States from foreign countries.
In the original petition, each of the 99 plaintiffs asserted a claim for “overtime” compensation by virtue of having been required by the defendant to work sometimes “at night and on Sundays and holidays” during the 6-year period immediately preceding the filing of the petition on March 22, *728 1966. Subsequently, four of the plaintiffs who are assigned to the San Diego-San Ysidro Quarantine Station in California filed a supplemental petition asserting claims for “hazardous duty” pay for the period subsequent to January 29,1967.
The attorneys for the parties agreed, with the approval of the commissioner, that the initial trial would relate only to the claims of the plaintiff Harold C. Hurt (48), one of the four San Diego-San Ysidro plaintiffs mentioned in the last sentence of the preceding paragraph. Mr. Hurt’s claim for overtime compensation was regarded as representative of the overtime claims of the other 98 plaintiffs, and his claim for hazardous duty pay was regarded as representative of the hazardous duty claims of the other three San Diego-San Ysidro plaintiffs. It was further agreed that the trial would be limited to the issues of fact and law pertaining to the plaintiff Hurt’s right to recover, reserving the determination of the amount of the recovery (if any) for further proceedings under Rule 131 (c).
The plaintiff Hurt has been employed by the Foreign Quarantine Division of the Public Health Service since November 9,1959, and he has been assigned to the San Diego-San Ysidro Quarantine Station in California since December 6, 1959. From the time of his employment until February 2, 1965, the plaintiff Hurt held the position of Quarantine Border Inspector, GrS-7. On February 2, 1965, the title of his position was changed to Quarantine Inspector and the grade of his position was increased to GS-9.
It is my opinion that the plaintiff Hurt is not entitled to recover on either of his claims.
A. The “Overtime” Claim
During the period that is involved in this suit, the plaintiff Hurt has sometimes been assigned to work on Sundays or holidays, or between the hours of 6 p.m. and 6 a.m. on other days, as part of his regularly scheduled 8-hour workday and 40-hour workweek. In the present suit, he claims — and the defendant denies — that he should have been paid “overtime” compensation for such work under the provisions of Section *729 364(c) of the Public Health Service Act, as amended (42 U.S.C.§267(c) (1964)).
The matter of the compensation, payable to Quarantine Inspectors of the Public Health Service for work performed at night, or on Sundays or holidays, has been complicated by the circumstance that Quarantine Inspectors perform their functions at ports of entry alongside inspectors who are employed by the Customs Bureau, Department of the Treasury, and inspectors who are employed by the Immigration and Naturalization Service, Department of Justice, and such inspectors are covered by special statutory provisions which grant them an unusually high rate of compensation (in comparison with other Government personnel) for work done at night or on Sundays or holidays.
With respect to Government personnel generally, “overtime” is work performed in excess of 8 hours in a day, or in excess of 40 hours in a workweek; and an employee holding a position in grade GS-10 or lower is compensated for overtime at I14 times his basic rate of pay (5 U.S.C. § 5542 (1964, Supp. V, 1965-69)). On the other hand, any work performed by a Customs Inspector or an Immigrant Inspector between 5 p.m. and 8 a.m., or on Sundays or holidays, is “overtime” and is compensable:
* * * on the basis of one-half day’s additional pay for each two hours or fraction thereof of at least one hour that the overtime extends beyond five o’clock postmeridian (but not to exceed two and one-half days’ pay for the full period from five o’clock postmeridian to eight o’clock antemeridian), and two additional days’ pay for Sunday or holiday duty. * * * [1]
In the summer of 1954, both the House of Representatives and the Senate passed H.R. 6253, 83d Cong., which would have placed Quarantine Inspectors of the Public Health Service on a parity with Customs Inspectors and Immigrant Inspectors with respect to work performed at night or on Sundays or holidays. Under this bill, any work performed by a Quarantine Inspector between 5 p.m. and 8 a.m., or *730 on Sundays or holidays, would have been “overtime” and would have been compensable on the same basis as that quoted in the preceding paragraph.
However, President Eisenhower withheld his approval, and H.E. 6253, 83d Cong., was not enacted. In explaining his position, the President stated in part that:
* * * the premium rates for Customs and Immigrant Inspectors are so far out of line with prevailing industrial and government practice that I do not believe extending their use to other groups of Federal employees would be good management. * * *
During the sessions of the 84th Congress, several bills similar in effect to H.E. 6253, 83d Cong., were introduced, i.e., H.E. 476, S. 1370, H.E. 5798, and H.E. 11871, but none of these bills passed either House of Congress.
However, since August 1, 1958, Section 364(c) of the Public Health Service Act, as amended (42 U.S.C. § 267(c) (1964)), has constituted a special provision of law relating to the compensation of Quarantine Inspectors for “overtime,” and has provided in part as follows:
(c) The Surgeon General shall fix a reasonable rate of extra compensation for overtime services of employees of the United States Public Health Service, Foreign Quarantine Division, performing overtime duties * * *, when required to be on duty between the hours of 6 o’clock postmeridian and 6 o’clock ante-meridian * * *, or on Sundays or holidays, such rate, in lieu of compensation under any other provision of law, to be fixed at two times the basic hourly rate for each hour that the overtime extends beyond 6 o’clock * * * postmeridian, and two times the basic hourly rate for each overtime hour worked on Sundays or holidays. * * *
The language just quoted, which was enacted with the approval of President Eisenhower, is clear and unambiguous. The provision is applicable to “overtime services” of Quarantine Inspectors “performing overtime duties,” and it provides for premium pay when the “overtime” is performed between 6 p.m. and 6 a.m., or on Sundays or holidays. There is nothing in the statutory language to warrant an interpretation that the term “overtime” was used in any *731 sense other than the ordinary one of meaning work performed in excess of 8 hours in a day or 40 hours in a workweek. Previous efforts to obtain for Quarantine Inspectors special legislation under which any work done at night or on Sundays or holidays would have constituted “overtime” had been unsuccessful due to the opposition of President Eisenhower; and there is no adequate basis for concluding that the Congress and President Eisenhower, in enacting the statutory language now under consideration, were attempting to accomplish what the President had expressly refused to approve some 4 years earlier.
The plaintiff Hurt also asserts a subsidiary claim for “overtime” compensation as a Customs Inspector or an Immigrant Inspector (under the special statutory provisions previously mentioned as being applicable to “overtime” performed by such inspectors) with respect to work performed at night, or on Sundays or holidays, during the period which began in the latter part of 1962. For a proper understanding of this claim, it is necessary to explain in some detail the operations of the federal inspectional agencies at the San Diego-San Ysidro port of entry, which includes a land border port, a seaport, and an airport.
The land border port is located approximately 18 miles south of downtown San Diego, at the San Ysidro Border Inspection Station on the Mexican border. This station includes the inspectional facilities of the Foreign Quarantine Division, Public Health Service, of the Bureau of Customs, Department of the Treasury, of the Immigration and Naturalization Service, Department of Justice, and of the Plant Quarantine Division, Department of Agriculture. The facilities at the station are commonly referred to as “vehicular primary,” “vehicular secondary,” the “main office,” and “pedestrian primary.”
The vehicular primary inspection area is where automobiles crossing the border from Mexico into the United States are first inspected. The automobiles pass under a canopy that is approximately 25 feet wide. Since 1963, inspections have been perf ormed at a maximum of 14 or 15 of the 19 lanes in vehicular primary. When an automobile and its contents have been subjected to a primary screening at vehicular pri *732 mary and it appears on the basis of such screening that no further inspection is necessary — i.e., that the automobile and its contents are clearly entitled to enter the United States— the automobile is allowed to proceed into the United States.
The vehicular secondary inspection area is where automobiles are referred (by inspectors at vehicular primary) for a more detailed inspection if entitlement to entry into the United States seems questionable on the basis of the primary screening at vehicular primary. Vehicular secondary is located approximately 100 yards from vehicular primary. All four inspectional agencies (Foreign Quarantine, Customs, Immigration, and Plant Quarantine) have office space in a building at vehicular secondary. There is parking space at vehicular secondary for 32 automobiles. If an automobile is referred to vehicular secondary, a final determination is made there as to whether the automobile and its contents are entitled to enter the United States.
The main office is a building which provides office space for all four of the inspectional agencies previously mentioned.
The pedestrian primary inspection area is located at the eastern end of vehicular primary. The main office of the Foreign Quarantine Division serves as pedestrian secondary for Public Health Service matters.
Prior to November of 1962, the Quarantine Inspectors of the Public Health Service at San Ysidro performed inspec-tional services only for their own agency, and the inspectors of the other agencies operating at San Ysidro did not perform any inspectional services for the Public Health Service. During such period, the Quarantine Inspectors were able to inspect only about 30 percent of the people crossing the border from Mexico into the United States at San Ysidro.
In order to obtain 100 percent coverage for all four inspec-tional agencies at San Ysidro, as well as to simplify the border inspectional procedure and more effectively utilize available manpower, the four agencies inaugurated a “multiple screening” program at San Ysidro in November 1962. The term “multiple screening” refers to “a procedure whereby a single inspector from any of the four inspectional agencies performs primary screening functions for all four agen *733 cies — admitting those persons, vehicles * * *, or things found to be eligible and referring those requiring more detailed inspection to the appropriate agency for secondary inspection.” Thus, each inspector from each inspectional agency has been required since November 1962 to have a working knowledge of the basic inspectional requirements set by all four of the agencies.
In connection with the multiple screening program, the plaintiff Hurt was given an additional designation as an Immigrant Inspector, without additional compensation, by the Immigration and Naturalization Service effective December 5, 1962; he was given an additional designation as a Customs Inspector, without additional compensation, by the Bureau of Customs effective December 31,1962; and he was given an additional designation as a Plant Quarantine Inspector, without additional compensation, by the Plant Quarantine Division effective November 10,1964. It was indicated that the additional duties for the several inspectional agencies were to be performed in conjunction with his regular duties for the Public Health Service.
Since the inauguration of the multiple screening program, the plaintiff Hurt has been performing primary screening operations for all four inspectional agencies when assigned to work in the vehicular primary inspection area at San Ysidro. However, his tours of duty at vehicular primary (and elsewhere) are determined by his Foreign Quarantine Division supervisor, and not by any representative of the Customs Bureau or of the Immigration and Naturalization Service.
When working on the 8 a.m. to 4 p.m. shift, the plaintiff Hurt moves every 30 minutes from vehicular primary to vehicular secondary to the main Foreign Quarantine office, and he repeats the cycle every 90 minutes. When working on the 4 p.m. to midnight shift, the plaintiff Hurt moves on a rotating basis between the Foreign Quarantine office and vehicular secondary, serving 1 hour at each place. He does not serve at vehicular primary on the 4 p.m. to midnight shift. When working on the midnight to 8 a.m. shift, the plaintiff Hurt serves at vehicular primary for three different periods totalling 3 hours or 3 hours and 20 minutes. Between the pe *734 riods of duty at vehicular .primary, he rotates every 20 minutes from vehicular secondary to pedestrian primary to the main Foreign Quarantine office.
While working at vehicular primary on the 8 a.m. to 4 p.m. shift, or on the midnight to 8 a.m. shift, the plaintiff Hurt performs primary inspeotional duties not only for the Foreign Quarantine Division of the Public Health Service, but also for the Customs Bureau of the Treasury Department, for the Immigration and Naturalization Service of the Justice Department, and for the Plant Quarantine Division of the Agriculture Department. If it appears on the basis of his primary screening that an automobile and its contents are clearly entitled to enter the United States under the requirements of the four agencies, he has the authority to permit the automobile to proceed into the United States. On the other hand, if he concludes that entitlement to enter the United States is questionable by virtue of some requirement of one of the inspeotional agencies, he refers the automobile to the particular agency at vehicular secondary which has jurisdiction over the questionable matter. The plaintiff Hurt performs only primary inspeotional functions for the Customs Bureau, for the Immigration and Naturalization Service, and for the Plant Quarantine Division; and he performs such functions in connection with the performance of his regular duties for the Public Health Service.
Although the plaintiff Hurt holds an additional designation as a Customs Inspector and an additional designation as an Immigrant Inspector, and although he performs primary inspectional functions for the Customs Bureau and the Immigration and Naturalization Service when he is working at vehicular primary, he does not come within the scope of the special legislation which provides premium “overtime” compensation for Customs Inspectors and Immigrant Inspectors. The statutory provision under which Immigrant Inspectors receive premium pay for “overtime” expressly states that it is applicable to “immigration officers and employees of the Immigration and Naturalization Service” (8 U.S.C. § 1353a (Supp. V, 1965-69)), and the similar provision relating to “overtime” compensation for Customs Inspectors indicates by implication that it is applicable to employees of the Treasury *735 Department, since it confers upon the Secretary of the Treasury the authority to fix such compensation (19 U.S.C. § 267 (1964)), and the Secretary of the Treasury does not have jurisdiction to fix the compensation of personnel outside the Treasury Department. The plaintiff Hurt is not an employee of the Immigration and Naturalization Service or of the Treasury Department, but of the Public Health Service. Furthermore, the primary inspectional functions which he performs for the two agencies just mentioned are performed in connection with the performance of his regular duties as an employee of the Public Health Service.
It is difficult to perceive any persuasive reason in logic or fairness why Customs Inspectors and Immigrant Inspectors, on the one hand, and Quarantine Inspectors, on the other hand, should be compensated on different bases for work done at night or on Sundays or holidays, when all of them perform similar duties and work in conjunction with each other at ports of entry. However, the matter of correcting any inequality is for the consideration of the Congress and the President in the normal lawmaking process, rather than for action by the courts.
B. The “Hazardous Duty” Claim
In the supplemental petition, the plaintiff Hurt and the other three San Diego-San Ysidro plaintiffs assert that from time to time, in connection with the inspection of automobiles at the San Ysidro Border Inspection Station, each of them has been “exposed to dangerously high concentrations of carbon monoxide”; that such concentrations, “when introduced into a human body, are likely to cause serious disease or fatality”; and, therefore, that each of the four San Diego-San Ysidro plaintiffs is entitled to be paid the “hazard pay differential” provided for in 5 U.S.C. § 5545(d) (1964, Supp. V, 1965-69).
The statutory provision cited in the preceding paragraph authorizes the Civil Service Commission to “establish a schedule or schedules of pay differentials for irregular or intermittent duty involving unusual physical hardship or hazard.”
*736 As indicated in part A of this opinion, the plaintiff Hurt performs, on an intermittent but regularly scheduled basis, inspeetional duties at vehicular primary in San Ysidro. This is the point where automobiles wishing to enter the United States from Mexico are initially inspected. The evidence in the record indicates that he and other inspectors, while working at vehicular primary, are exposed to environmental carbon monoxide contained in the exhaust fumes of automobiles. For example, the amount of environmental carbon monoxide at vehicular primary was continuously monitored on all shifts beginning with the 4 p.m. to midnight shift on October 3, 1969, and extending through the 4 p.m. to midnight shift on October 8, 1969; and the pertinent data from this study are set out in finding 33. In this connection, it should be noted that the time-weighted average of 50 parts of carbon monoxide per million is regarded as acceptable by the American Conference of Governmental Industrial Hygienists, and that this level was exceeded on three shifts, i.e., on the 4 p.m. to midnight shift on October 4, on the midnight to 8 a.m. shift on October 5, and on the midnight to 8 a.m. shift on October 6. With respect to these particular shifts, it should be mentioned that the plaintiff Hurt never works at vehicular primary on the 4 p.m. to midnight shift (so the October 4 data for that shift would not be applicable to him), and that October 5 and 6, 1969, were days of the so-called “Operation Intercept” when automobiles entering the United 'States from Mexico were detained at vehicular primary for unusually long periods of time while being inspected thoroughly for contraband drugs (so the data for those days would not be representative of conditions at vehicular primary in San Ysidro).
The record also contains the results of two test programs that were conducted for the purpose of determining the effect of exposure to environmental carbon monoxide on inspectors working at vehicular primary in San Ysidro. On Sunday and Monday, November 17 and 18, 1968, blood samples were taken by the Public Health Service from a total of 24 inspector's coming off duty at vehicular primary. The blood samples *737 were analyzed to determine the actual carbon monoxide loadings in the blood, otherwise known as the carboxyhemoglobin percentage. The evidence shows that there was a mean car-boxyhemoglobin percentage of 2.9 for non-smokers and of 6.5 for smokers. In connection with this test, there was no prohibition against the smokers following their normal smoking pattern.
The second test program was conducted with respect to inspectional personnel working in vehicular primary at San Ysidro on October 5 and 6,1969 (when Operation Intercept was in progress), by a private organization at the request of the plaintiffs. Prior to this test, those inspectors who customarily smoked were directed not to smoke for 8 hours before going on duty or during duty. The data from this test program reflected a mean carboxyhemoglobin percentage of 3.6 for non-smokers and of 6.4 for smokers.
With respect to the differential in the carboxyhemoglobin percentages for smokers and non-smokers, the evidence in the record shows that the smoke stream from a cigarette contains carbon monoxide to the extent of from 400 to 450 parts per million; that a heavy smoker customarily develops a substantial percentage of carboxyhemoglobin (7 percent or higher) as a consequence of smoking and without any other exposure to environmental carbon monoxide; and that it takes more than 8 hours of non-smoking for a heavy cigarette smoker to “unload” the carboxyhemoglobin from his blood. The plaintiff Hurt is a heavy cigarette smoker.
The medical experts who testified for the plaintiffs and for the defendant (see findings 36 and 37) were in agreement that, in the light of the present state of medical knowledge, it cannot be stated positively that carboxyhemo-globin percentages within the range of those reflected by the present record will have a harmful effect on the persons involved, irrespective of whether such persons are non-smokers or smokers. The plaintiffs’ expert would merely say that, as to non-smokers, there is a possibility that toxic effects occurred from the levels of carboxyhemoglobin that were reached in the non-smokers from their exposure to environmental carbon *738 monoxide at vehicular primary in San Ysidro. He was not prepared to go even this far with respect to the possibility of harmful effects on the smokers. As previously stated, the plaintiff Hurt is a heavy cigarette smoker.
It necessarily follows that the plaintiff Hurt has failed to prove that his duties at vehicular primary in San Ysidro have caused him to be “exposed to dangerously high concentrations of carbon monoxide,” which “are likely to cause serious disease or fatality,” as alleged in the petition.

The opinions of Kunzig, Judge, concurring, and Davis, Judge, dissenting in part and concurring in part, follow the opinion of the Trial Commissioner which has been adopted by the court

 19 u.S.C. §267 (1964) and 8 U.S.C. § 1353a (Supp. V, 1965-69). In the provision relating to Immigrant Inspectors, the concluding phrase In the quotation is “Sunday and holiday duty” instead of “Sunday or holiday duty.”