# Anti-Lobbying Restrictions Applicable to Community Services Administration Grantees

The anti-lobbying rider in the Community Services Administration (CSA) appropriation act is broader than the generally applicable restrictions on lobbying by executive officers, and prohibits recipients of CSA grant funds from engaging in any activity designed to influence legislation pending before Congress, including direct contacts with Congress.

Congress is under no obligation to make funds available to any agency for every authorized activity in any given fiscal year, and there should be no presumption that it has done so.

The anti-lobbying statute, 18 U.S.C. § 1913, and the general "publicity and propaganda" rider in the General Government Appropriations Act, have been narrowly construed to prohibit the use of federal funds for "grassroots" lobbying, but not to prohibit a wide range of necessary communications between the Executive on the one hand, and Congress and the general public on the other. The considerations that underlie this narrow construction are irrelevant to a prohibition against lobbying by private persons receiving federal grants and contracts.

Statements made by individual legislators and committees after the enactment of legislation carry little weight in statutory interpretation, and are not a sufficient basis for altering a conclusion required by the plain meaning of the statutory language.

June 17, 1981

## MEMORANDUM OPINION FOR THE COUNSEL TO THE DIRECTOR, OFFICE OF MANAGEMENT AND BUDGET

On January 19, 1981, the Director of the Community Services Administration (CSA) published in the Federal Register an interpretive ruling by the CSA General Counsel discussing the legal effect of an "anti-lobbying" rider that applies to CSA appropriations. *See* 46 Fed. Reg. 4919. The history and language of the rider are set out in the margin.[1] In his ruling, the CSA General Counsel concluded that the

---

[1] The rider derives from a provision that first appeared in the FY 1979 appropriation for the Departments of Labor, Health, Education and Welfare, and related agencies. *See* Pub. L. No 95–480, § 407, 92 Stat. 1589 (1978). The provision has since been carried forward in successive public laws and resolutions applicable to those agencies. *See, e.g.,* Pub. L. No. 96–536 [H.J. Res. 644], 94 Stat. 3166 (1980), *as amended by* Act of June 5, 1981 [H.R. 3512], Pub. L. No. 97–12, 95 Stat. 14, *See* 127 Cong. Rec. S5796–S5807 (daily ed. June 4, 1981). The language of the rider is as follows:

> No part of any appropriation contained in this Act shall be used, other than for normal and recognized executive-legislative relationships, for publicity or propaganda purposes, for the preparation, distribution, or use of any kit, pamphlet, booklet, publication, radio, television, or film presentation designed to support or defeat legislation pending before the Congress, except in presentation to the Congress itself. No part of any appropriation contained in this Act shall be used to pay the salary or expenses of

Continued

180

rider, in its application to CSA *grantees,* imposes anti-lobbying restrictions that are no more stringent than those imposed upon executive officers and employees by 18 U.S.C. § 1913[2] and by the traditional "publicity and propaganda" rider contained in the Treasury, Postal Service, and General Government Appropriations Act.[3] In reliance upon that legal conclusion, the Director of CSA "waived" certain anti-lobbying restrictions contained in existing CSA grants. Those restrictions were apparently based upon an older, more stringent interpretation of the rider. You have asked whether, in the opinion of this Office, the conclusions reached by the General Counsel were legally correct.

## I.

The CSA rider imposes two different kinds of restrictions on the use of appropriated funds. The first, set forth in the first sentence of the rider, prohibits the use of funds "for publicity and propaganda purposes" or for the preparation or use of any "kit, pamphlet, booklet, publication, radio, television, or film presentation designed to support or defeat legislation pending before Congress, except in presentation to the Congress itself." This language is similar to the language of the traditional "publicity and propaganda" rider contained in the General Appropriations Act. Unlike the traditional rider, however, the CSA rider catalogs the kinds of materials and "presentations" for which appropriated funds may not be expended (kits, pamphlets, etc.), and it authorizes at least two kinds of expenditures. It expressly permits expenditures for the maintenance of "normal and recognized executive-

---

any grant or contract recipient or agent acting for such recipient to engage in any activity designed to influence legislation or appropriations pending before the Congress.

In its present form, the rider applies by its terms to all appropriations made or continued by the relevant Act, including appropriations for the Departments of Labor, Health and Human Services, Education, and the Community Services Administration, among others

[2] Section 1913 provides as follows:

No part of the money appropriated by any enactment of Congress shall, in the absence of express authorization by Congress, be used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, to favor or oppose, by vote or otherwise, any legislation or appropriation by Congress, whether before or after the introduction of any bill or resolution proposing such legislation or appropriation; but this shall not prevent officers or employees of the United States or of its departments or agencies from communicating to Members of Congress on the request of any Member or to Congress, through the proper official channels, requests for legislation or appropriations which they deem necessary for the efficient conduct of the public business

Whoever, being an officer or employee of the United States or of any department or agency thereof, violates or attempts to violate this section, shall be fined not more than $500 or imprisoned not more than one year, or both; and after notice and hearing by the superior officer vested with the power of removing him, shall be removed from office or employment.

[3] *See* Pub. L. No. 96–74, § 607, 93 Stat. 575. The language of the traditional rider is as follows:

No part of any appropriation contained in this or any other Act, or of the funds available for expenditure by any corporation or agency, shall be used for publicity or propaganda purposes designed to support or defeat legislation pending before Congress.

181

legislative relationships," and it seems to contemplate that funds may be expended for the preparation of kits, pamphlets, and other "presentations" that are made directly to Congress itself.

The second restriction is set out in the second sentence of the rider. Unlike the first, it applies only to persons who receive appropriated funds under government grants or contracts. The second sentence states flatly that "[n]o part of any appropriation contained in this Act shall be used to pay the salary or expenses of any grant or contract recipient or agent acting for such recipient to engage in any activity designed to influence legislation or appropriations pending before Congress." Because this language forbids the payment of expenses for "any activity" designed to influence legislation pending before Congress, it is far broader than the language of the traditional "publicity and propaganda" rider. Moreover, because it applies expressly to grantees and contractors and makes no express provision for direct contacts with Congress, it is quite unlike the language of the "anti-lobbying" statute, 18 U.S.C. § 1913.

In his interpretive ruling, the General Counsel concluded that the two sentences of the CSA rider should be read together. His opinion states that the two sentences impose a single restriction upon the use of federal funds, a restriction that applies equally to federal agencies and federal grantees. He concluded that for agencies and grantees alike, the rider prohibits "grassroots lobbying" and nothing more.

We agree with the General Counsel's conclusion regarding the application of the rider to federal agencies; but for the reasons given below, we cannot agree with his conclusion regarding the application of the rider to federal grantees.

II.

In our view, the language of the second sentence of the rider imposes an unqualified prohibition against payment of expenses incurred by grantees in any activity designed to influence legislation pending before Congress. The meaning of the language is quite clear when the second sentence is considered alone. The meaning is made even clearer when the second sentence is read in context with the first. The first sentence makes provision for normal and appropriate "relationships" between the Legislative and Executive Branches of government; it is conspicuously silent with regard to federally financed "relationships" between Congress and federal grantees. The first sentence prohibits federal agencies from expending appropriated funds only for "publicity and propaganda" or for the preparation of certain kits, pamphlets, and presentations. The second sentence forbids grantees and contractors to expend appropriated funds for *any* activity designed to influence pending litigation.

182

We believe, in short, that these two sentences impose two different anti-lobbying restrictions: one, a traditional "publicity and propaganda" restriction applicable to officers and employees of the government; the other, an unqualified prohibition against lobbying by federal grantees. The meaning of the rider is so plain on the face of the text that we could not accept another interpretation unless there were persuasive reasons for doing so.

The General Counsel gave three reasons for interpreting the rider narrowly in its application to CSA grantees. He argued, first, that if the rider were read broadly, it would prevent CSA grantees from carrying out their contractual obligation to be advocates for the poor. He also noted that CSA itself is required by statute to "stimulate a better focusing of federal resources on behalf of the poor," and he argued that the rider should not be read to frustrate that statutory mission. Second, he argued that 18 U.S.C. § 1913 and the General Appropriations rider have been construed narrowly and that the CSA rider should be given a similar interpretation so that the mission of CSA and the CSA grantees will not be frustrated. Finally, he noted that Senator Warren Magnuson, Chairman of the Senate Labor, Health and Human Services and Education's Appropriation Subcommittee, stated in a letter to the Director of CSA that his subcommittee did not intend the rider to prevent CSA and its grantees from: (1) responding to any request for information from Members of Congress; (2) providing educational information to Congress and the public in general on the effects of legislative issues on individuals and/or communities; and (3) providing information to Congress concerning legislative issues which directly affect the continued existence of CSA or its grantees.

In our opinion, the reasons given in support of the General Counsel's interpretation neither require nor justify a narrow reading of the statutory prohibition against lobbying by grantees. Our research has not uncovered any other consideration that would require us to alter our initial conclusion that the rider means what it says. We will discuss the relevant points below.

*Contractual and statutory obligations.* The General Counsel suggested that a strict reading of the rider would prevent grantees from discharging their obligations under their grants. But federal grantees cannot be required to do what federal law prohibits. Even if we could accept the contention that existing grant provisions require CSA grantees to use appropriated funds to lobby for or against specific legislation pending before Congress,[4] the existence of that "requirement" would not be a valid reason for interpreting the appropriations rider either narrowly or broadly.

---

[4] In fact, existing CSA grants contain express anti-lobbying provisions, which were "waived" in the January 19, 1981, publication. In light of those provisions, we simply do not understand the argument that the contractual obligations of CSA grantees collided with the appropriations rider.

Regarding the related but somewhat different contention that the organic legislation governing CSA conflicts with the rider, two observations are in order. First, insofar as CSA itself is concerned, the rider expressly authorizes normal legislative-executive relationships, and it prohibits only "publicity and propaganda." A similar prohibition applies to each agency of the government. There is nothing in the CSA rider that prevents CSA itself from discharging its statutory mission. Second, insofar as the grantees are concerned, we have reviewed the relevant legislation carefully; [5] and it is far from clear to us that any specific congressional purpose behind that legislation would be frustrated if CSA grantees were forbidden to use federal money to lobby for or against specific measures actually pending before Congress. More importantly, even if one could conclude that the grantees are authorized by the organic legislation to use federal money for lobbying purposes, Congress is under no obligation to make money available for that purpose in any given fiscal year. Indeed, the express language of the rider suggests that Congress has expressly declined to make money available for that purpose in the current fiscal year, and there is no principle of interpretation or construction that prevents executive officers or the courts from giving full effect to that fiscal purpose. It is true, as the General Counsel points out, that statutes should be construed harmoniously and that unnecessary conflicts should be avoided, but that principle carries little force in the appropriations context. Just as there is no presumption that the availability of funds alters substantive limitations on statutory authority, see TVA v. Hill, 437 U.S. 153 (1978), there is no presumption that Congress has made funds available for every authorized purpose in any given fiscal year. See Opinion of Comptroller General for Honorable F. James Sensenbrenner, Jr., printed in 127 Cong. Rec. H1843, 1845 (daily ed. May 5, 1981) ("An appropriation restriction may forbid the use of funds by an agency even for some activity authorized in its organic legislation.").

*Traditional interpretation of the anti-lobbying statute and the general appropriations rider.* As the General Counsel points out, the anti-lobbying statute and the general "publicity and propaganda" rider have been construed to prohibit federal officers and employees from using federal funds to mount "grassroots campaigns." We know of no reason to conclude that the same narrow construction should be given to the language of the second sentence of the CSA rider, which on its face imposes an unqualified prohibition against "any activity" by federal grantees designed to influence pending legislation. We have already noted the significant differences between the language of the CSA rider and the language of the other two provisions. There are more fundamental differences as well.

---

[5] The relevant statutes are codified in scattered sections of Chapter 34 of 42 U.S C. *See, e.g.,* 42 U.S C. § 2790 *et seq.,* § 2861 *et seq.,* § 2981 *et seq.*

The Constitution contemplates that there will be an active interchange between Congress, the Executive Branch, and the public concerning matters of legislative interest. For that reason alone, this Department has traditionally declined to read the criminal statute and the general rider as requiring federal officers and employees to use their own funds and their own time to frame necessary communications to Congress and the public. We have taken the view that the criminal statute and the general rider impose no such requirement. They permit a wide range of contact between the Executive and the Congress and the Executive and the public in the normal and necessary conduct of legislative business.

The prudential considerations that underlie this narrow and necessary construction are largely irrelevant to prohibitions against lobbying by private persons and organizations that receive federal funds under federal grants and contracts. Although private persons and organizations have a right to petition Congress and to disseminate their views freely, they can be expected, within the framework established by the Constitution, to do their lobbying at their own expense. They have no inherent or implicit right to use federal funds for that purpose unless Congress has given them that right. In the case of the CSA grantees and other grantees covered by the rider, Congress appears to have expressly intended to forbid the use of federal funds by grantees for lobbying purposes.

*Subsequent legislative history.* The General Counsel declared that there is no formal legistative history that casts light on the legislative intentions behind the CSA rider. We do not disagree with that conclusion; however, the General Counsel relied upon a letter addressed to the Director of CSA by Senator Warren Magnuson, in which the Senator expressed the view that his subcommittee did not intend the rider to prevent CSA grantees from engaging in certain activities. We have described the contents of that letter in some detail in the paragraphs above.

When a legislative proposal is pending before Congress, the statements and reports of individual legislators or legislative committees concerning the meaning or effect of the proposal are part of the legislative record; and they carry force, as sources for interpretation, if the proposal is enacted into law. Because they were before the Congress and were presumably considered by Congress at the time of enactment, they are some evidence of what a majority of the Congress may have intended the proposal to accomplish. On the other hand, statements made by individual legislators and committees *after* enactment carry little force as a legal matter, because at best they are evidence only of what individual intentions may have been. Thus it is a traditional rule that "subsequent legislative history" is entitled to little weight in matters of statutory interpretation. *See, e.g., TVA* v. *Hill,*

*supra; Regional Rail Reorganization Act Cases,* 419 U.S. 102, 132 (1974); *Allyn* v. *United States,* 461 F.2d 810, 811 (Ct. Cl. 1972); 2A Sutherland Statutory Construction § 48.16 (Sands ed. 1973).

In accordance with that rule, even if Senator Magnuson's statements had been made, not in a letter to the Director of CSA, but in a subsequent committee report or a subsequent congressional debate, they would carry little force as a matter of interpretation and would not be a sufficient basis for altering the conclusion that seems to be required by the plain meaning of the statutory language.

CSA grantees, and other grantees covered by the rider, may not use appropriated funds to engage in activities designed to influence legislation pending before Congress.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*