**Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Plaintiff-Appellee,**

v.

**HOTEL, MOTEL AND RESTAURANT EMPLOYEES AND BARTENDERS UNION, LOCAL 19, HOTEL AND RESTAURANT EMPLOYEES AND BARTENDERS INTERNATIONAL UNION, AFL–CIO, Defendant-Appellant.**

No. 82–4030.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 2, 1982.

Decided Feb. 28, 1983.

Barry Jellison, David, Crowell & Bowe, San Francisco, Cal., for defendant-appellant.

Helene Boetticher, Washington, D.C., for plaintiff-appellee.

Before CHOY, SNEED and FARRIS, Circuit Judges.

CHOY, Circuit Judge:

A union appeals from a district court order that it conduct a removal proceeding against one of its officers under the supervision of the Secretary of Labor. We reverse.

I

On June 1, 1978, Frank C. Marolda, president and business manager of Hotel, Motel and Restaurant Employees and Bartenders Union, Local 19 ("Local 19") was indicted on 33 counts of mail fraud and one count of embezzling union funds, 29 U.S.C. § 501(c). The mail-fraud charges were dismissed by the district court; a conviction under § 501(c) was eventually reversed by this court. *See United States v. Marolda,* 648 F.2d 623 (9th Cir.1981).[1] On May 9, 1979, Catherine E. Mullens, a member of Local 19, filed internal union charges against Marolda in accordance with the constitution of the international union and the bylaws of Local 19.[2] Mullens' charges tracked those of the federal prosecution of Marolda.

More than 3 months of union inaction followed the filing of charges, prompting Mullens to file a complaint with the Secretary of Labor ("Secretary") on August 30, 1979. Subsequently, on November 13, 1979, the financial secretary-treasurer of Local 19, Ron Davis, notified Marolda and Local 19 vice president Vincent Curci of Mullens' charges against Marolda. Later that month, Curci was designated by the international union president to name a trial committee to hear Mullens' charges. Curci did not actually name a trial committee

until July 8, 1981, shortly after our ruling on Marolda's appeal from his federal conviction. Two days later, the union trial committee informed Mullens that it intended to dismiss her charges unless she could demonstrate good cause why they should not be dismissed. Mullens' July 13, 1981, response stated that she did not intend to drop her charges, and that she did not feel the merits of those charges had been addressed in the rulings of the federal courts on the Marolda prosecution. Nevertheless, the trial committee dismissed Mullens' charges, informing Mullens of this by letter dated July 16, 1981.

Meanwhile, on November 29, 1979, the Secretary brought an action against Local 19 under Title IV of the Labor-Management Reporting and Disclosure Act of 1959, ("LMRDA"), 29 U.S.C.A. §§ 481–83. The complaint alleged that Local 19 had violated the LMRDA "by failing to follow its Constitution and By-Laws pertaining to removal of an elected officer guilty of serious misconduct." Complaint, § VIII. The Secretary concedes that the constitution and bylaws governing Local 19 provide an adequate removal procedure but argues that they were not followed in this instance. On November 17, 1981, the district court granted the Secretary's motion for summary judgment and on November 24, 1981, ordered Local 19 to conduct a removal proceeding against Marolda under the supervision of the Secretary.

The dispositive question on this appeal is whether the LMRDA authorizes the Secretary to bring a civil action against a union for failure to follow its concededly adequate removal procedures.

II

A

Generally speaking, the LMRDA was enacted to "correct the abuses which have crept into labor and management ...."

---

1. *See also United States v. Marolda,* 615 F.2d 867 (9th Cir.1980) (earlier remand).

2. Mullens' earlier attempt to file charges was unsuccessful because she failed to file her complaint in triplicate as required by the union constitution.

S.Rep. 187, 86th Cong., 1st Sess. 2, *reprinted in* 1959 U.S.Code Cong. & Ad.News 2318, 2318, *and* 1 NLRB, *Legislative History of the Labor-Management Reporting and Disclosure Act of 1959*, 397, 398 (1959) (hereinafter "Leg.Hist."). *See* LMRDA § 2, 29 U.S.C. § 401; *Wirtz v. Local 153, Glass Bottle Blowers Association*, 389 U.S. 463, 469–70, 88 S.Ct. 643, 647, 19 L.Ed.2d 705 (1968); Cox, *Internal Affairs of Labor Unions Under the Labor Reform Act of 1959*, 58 Mich.L.Rev. 819 (1960). The primary goal of Title IV of the LMRDA "is to insure 'free and democratic' [union] elections." *Wirtz v. Bottle Blowers*, 389 U.S. at 470, 88 S.Ct. at 648. Title IV also regulates procedures for the removal of union officers. This is our first occasion to examine the reach of these provisions.

■ Union procedures for the removal of officers are governed specifically by § 401(h) of the LMRDA, 29 U.S.C. § 481(h). It states:

> If the Secretary, upon application of any member of a local labor organization, finds after hearing in accordance with the Administrative Procedure Act that the constitution and bylaws of such labor organization do not provide an adequate procedure for the removal of an elected officer guilty of serious misconduct, such officer may be removed, for cause shown and after notice and hearing, by the members in good standing voting in a secret ballot conducted by the officers of such labor organization in accordance with its constitution and bylaws insofar as they are not inconsistent with the provisions of this title.

It is clear that this section grants no authority for allowing the Secretary to intervene in union removal proceedings in the absence of a finding that the union's constitution and bylaws provide an inadequate removal procedure. This is in contrast to § 401(e)'s regulation of union *elections,* where it is required that "[t]he election shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with the provisions of this title." *See also* § 401(f).

The Secretary admits that § 401(h), standing alone, does not regulate a union whose removal procedures, as written, are adequate. However, the Secretary argues that Title IV has a "dual procedure" for removing union officers. The second part of the Secretary's proposed dual procedure is found in § 402, 29 U.S.C. § 482, the enforcement provisions of Title IV.

Section 402 enforces the provisions of Title IV in the following way: Section 402(a) permits union members to file complaints against their union with the Secretary. Section 402(b) obliges the Secretary to investigate a member's complaint. If he finds probable cause to believe Title IV has been violated, he must bring a civil action against the union. Section 402(c) governs the trial and disposition of the Secretary's suit. Lastly, § 402(d) regulates appeals from court orders.

The Secretary argues that a parenthetical in § 402(a) authorizes him to bring suit against a union for failure to follow its adequate removal procedures. In pertinent part, § 402(a) reads:

> A member of a labor organization—
>
> (1) who has exhausted the remedies available under the constitution and bylaws of such organization and of any parent body, or
>
> (2) who has invoked such available remedies without obtaining a final decision within three calendar months after their invocation,
>
> may file a complaint with the Secretary within one calendar month thereafter alleging the violation of any provision of section 401 (*including violation of the constitution and bylaws of the labor organization pertaining to the election and removal of officers*).

(Emphasis added.) The most natural reading of the emphasized parenthetical phrase is that it is meant to modify the preceding term, namely, "section 401," and not to place a further substantive restraint on union removal procedures. But to the extent the parenthetical purports to define the

reach of § 401, it is seemingly in error, since a violation of a union's constitution and bylaws relating to removal is generally not a violation of § 401.[3] To understand this apparent contradiction, an examination of the legislative history of the LMRDA is in order. *See United States v. Public Utilities Commission*, 345 U.S. 295, 315, 73 S.Ct. 706, 717, 97 L.Ed. 1020 (1953); *International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp.*, 518 F.2d 913, 917–18 (9th Cir.1975).

### B

The focus of our inquiry into the legislative history of the LMRDA is the Senate Committee on Labor and Public Welfare.[4] The original Senate version of the LMRDA, S. 505, 86th Cong., 1st Sess. (1959), *reprinted in* 1 Leg.Hist. 29, had a section governing removal procedures virtually identical to § 401(h) of the LMRDA. S. 505 § 301(f), 1 Leg.Hist. at 62.[5] The precursor to LMRDA § 402(a), however, had a different descriptive parenthetical. It read:

A member of a labor organization—

(1) who has exhausted the remedies available under the constitution and bylaws of such organization and of any parent body, or

(2) who has invoked such available remedies without obtaining a final decision within four calendar months after their invocation, may file a complaint

with the Secretary of Labor within one calendar month thereafter alleging the violation of any provision of section 301 [subsequently LMRDA § 401] (*including violation of the constitution and bylaws of the labor organization*).

S. 505 § 302(a), 1 Leg.Hist. 62–63 (emphasis added). S. 505, as written, did not present the ambiguity found in the LMRDA as enacted, because the parenthetical in S. 505 § 302(a) merely emphasizes the point that the members may file a complaint with the Secretary concerning any violation of § 301, even those subsections of § 301 requiring unions, in certain instances, to follow procedures found in their constitutions and bylaws.

The Senate Committee made over 40 amendments to S. 505 and reported it out in a clean bill as S. 1555. *See* 1 Leg.Hist. at vii. With one minor exception,[6] the reported bill contained sections identical to those finally enacted as LMRDA §§ 401(h) and 402(a), including the disputed parenthetical. *See* S. 1555, 86th Cong., 1st Sess. §§ 301(g), 302(a) (1959), *reprinted in* 1 Leg.Hist. 338, 375–76. The crucial question is what the Senate Committee intended by its amended parenthetical. For this we turn to the Committee report.

Part I of the Committee report is entitled "Purpose of the Bill." There we find the following statement: "In brief, the bill, S.

---

**3.** There is one exception to this statement, discussed *infra* Part II.C.

**4.** The House was working on a different track from that of the Senate on matters eventually covered by Title IV. The House Bill, H.R. 8400, 86th Cong., 1st Sess. (1959) (Landrum-Griffin), *reprinted in* 1 Leg.Hist. 619, did have a provision comparable to LMRDA § 401(h) in that it only allowed intervention in removal proceedings upon a finding that the union had inadequate removal procedures. *See* H.R. 8400 § 401(g), 1 Leg.Hist. at 656. (Although the House Bill was technically H.R. 8342, the text of H.R. 8400 was substituted for the original text of H.R. 8342 on the House floor.) However, the bill did not contain any language comparable to the LMRDA § 402(a) parenthetical, and, in fact, did not provide a role for the Secretary in enforcing Title IV. *See* H.R. 8400 § 402(a), 1 Leg.Hist. 657. Instead, theHouse bill would have allowed individual union mem-

bers to go directly to court if they were harmed by a violation of § 401. *Id.* The Conference committee explicitly adopted the provisions of the Senate Bill for both LMRDA § 401(h) and § 402(a). *See* H.R.Rep. No. 1147, 86th Cong., 1st Sess. 34–35, *reprinted in* 1959 U.S.Code Cong. & Ad.News 2503, 2506–07, *and* 1 Leg. Hist. 934, 938–39. (The reference on page 34 of the House Report to "Subsection (b)" is, from its context, plainly a misprint, and actually a reference to subsection (h).)

**5.** This section was amended on the Senate floor to provide that any hearing held by the Secretary to determine whether a union has adequate removal procedures shall be conducted in accordance with the Administrative Procedure Act. *See* 105 Cong.Rec. 6681–82 (1959), *reprinted in* 2 Leg.Hist. 1208–09.

**6.** *See* note 5, *supra*.

1555, would accomplish the following: . . . (30) Procedures whereby a union officer guilty of serious misconduct in office may be removed by a secret ballot vote after court proceedings *if the union's constitution does not provide adequate machinery for such removal . . . ."* S.Rep. 187, 86th Cong., 1st Sess. 2, 4, *reprinted in* 1959 U.S. Code Cong. & Ad.News 2318, 2318, 2320, *and* 1 Leg.Hist. 397, 398, 400 (emphasis added). This strongly suggests that the provisions in the bill allowing the Secretary to intervene in union removal proceedings make such intervention contingent on a finding of inadequate union procedures. The statement of purpose does not, however, explain the amended parenthetical. The section-by-section analysis of S. 1555 is notably unenlightening, since it merely reiterates the statutory language. *See* S.Rep. 187 at 47–48; 1959 U.S.Code Cong. & Ad. News at 2364–65; 1 Leg.Hist. at 443–44.

■ The mystery of the amended parenthetical is solved by a reading of Appendix B to the "Minority Views" presented in the Senate report. The significance of the minority statement justifies quotation at some length.

> [Section 302 of S. 1555, later LMRDA § 402] authorizes the Secretary to bring a civil action against the local union in a Federal court upon a complaint of a member of the local alleging that section 301 [LMRDA § 401] has been violated (i.e., that there is no adequate procedure for removal of officers in the local's constitution and bylaws) including violation "of the constitution and bylaws of the labor organization *pertaining to the election and removal of officers."* Despite the italicized language which was added at the insistence of the minority, the phraseology of this provision (sec. 302(a)) [LMRDA § 402(a)] is, at best, ambiguous in the extreme. It is exceedingly doubtful whether the Secretary is authorized to act on a complaint of a union member that his local's constitution and bylaws do contain an adequate procedure for the removal of officers, but the local or its officers is nevertheless refusing to comply with its own prescribed procedures in that regard. A close scrutiny of the language leads almost inevitably to the conclusion that these provisions establish a remedy in the courts through the Secretary *only* where the local's constitution and bylaws fail to provide an adequate procedure for removal of the local's elected officers, but do not give judicial relief where such a procedure exists but the local refuses to apply or follow it. The minority urged that section 301(g) [LMRDA § 401(h)] be modified to permit the Secretary to sue in the courts upon a finding that an adequate procedure was lacking or, where it was provided *was not being followed,* but the majority would not agree.

S.Rep. 187 at 103; 1959 U.S.Code Cong. & Ad.News at 2407; 1 Leg.Hist. at 499 ("Minority Views," Appendix B) (all emphases in original). The minority's interpretation of the removal provisions of the bill could conceivably be discounted as an attempt to encourage opposition to the bill.[7] But the

---

[7]. Generally speaking, the remarks of legislators opposed to legislation are given little weight in the construction of statutes. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 203 n. 24, 96 S.Ct. 1375, 1385–86 n. 24, 47 L.Ed.2d 668 (1976); *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 288, 76 S.Ct. 349, 360, 100 L.Ed. 309 (1956); *United States v. International Union of Operating Engineers,* 638 F.2d 1161, 1168 (9th Cir. 1979), *cert. denied,* 444 U.S. 1077, 100 S.Ct. 1026, 62 L.Ed.2d 760 (1980). However, where the statements are made at a point where a response by proponents of legislation would be appropriate, and there is no response, the statements of opposing legislators merit some consideration. *See Arizona v. California,* 373 U.S. 546, 583 n. 85, 83 S.Ct. 1468, 1489 n. 85, 10 L.Ed.2d 542 (1963); *Parlane Sportswear Co. v. Weinberger,* 513 F.2d 835, 837 (1st Cir.), *cert. denied,* 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975). An unanswered opposition statement made in a committee report is entitled to some weight, since "[a] committee report represents the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation." *Zuber v. Allen,* 396 U.S. 168, 186, 90 S.Ct. 314, 324, 24 L.Ed.2d 345 (1969). It follows that an erroneous statement in a committee report is more likely to draw a refutation than a statement made on the floor, or inserted unspoken into the Congressional Record.

Senate Committee's reported failure to agree to the minority's proposed amendment to S. 1555 § 301(g) (LMRDA § 401(h)) demonstrates a Congressional refusal to grant the Secretary the very power he seeks to exercise in this case.[8] This excerpt convinces us that the amended parenthetical was a cosmetic change agreed to by the majority on the understanding that the amendment did not entail an expansion of the Secretary's authority to intervene in union affairs.

Further evidence that Congress did not intend to confer upon the Secretary the authority he now claims is derived from an examination of another labor bill referred to the Senate Committee on Labor and Public Welfare during the period of the Committee's consideration of S. 505. This bill, S. 748, would have required that "[e]very labor organization shall have *and follow* procedures which effectively insure to its members the opportunity directly to remove elected officers from office by majority vote upon a showing that a substantial number of the members desire a recall vote." S. 748, 86th Cong., 1st Sess. § 302(c) (1959), *reprinted in* 1 Leg.Hist. 84, 112 (emphasis added). This bill, which was never reported out of committee, featured clear language that would require a union to follow its removal procedures. The absence

of such language from S. 1555, in the face of a competing bill containing such language, is further support for our conclusion that Congress did not intend to allow the Secretary to intervene upon a union's failure to follow its removal procedures where those procedures, as enacted, are adequate.

The Secretary has also mined the legislative history, and has found what he believes to be a nugget. Senator Goldwater, on August 28, 1959, placed into the record a study "prepared by a staff member" that summarizes action taken by the conference committee on the respective labor bills of the House and Senate. In its summary of Title IV, it states:

> Removal of union officers: House bill provides removal procedures where union constitution does not provide an adequate procedure for removal of union officers guilty of serious misconduct. Senate bill provides removal procedures even where there is an adequate procedure in union constitution but it is not being followed. Conference adopted Senate provision.

105 Cong.Rec. 17,327 (1959), *reprinted in* 2 Leg.Hist. at 1376.[9] For several reasons, we believe the wish was father to Senator Goldwater's vicariously attributed thought, and decline to assign it much weight.[10]

---

**8.** The rejection of a proposed amendment is entitled to weight in statutory interpretation. *See Fox v. Standard Oil Co.,* 294 U.S. 87, 96, 55 S.Ct. 333, 337, 79 L.Ed. 780 (1935); *Rogers v. Frito-Lay, Inc.,* 611 F.2d 1074, 1080 (5th Cir.), *cert. denied,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980); *National Automatic Laundry & Cleaning Council v. Shultz,* 443 F.2d 689, 706 (D.C.Cir.1971); *People for Environmental Progress v. Leisz,* 373 F.Supp. 589, 592 (C.D. Cal.1974). *See also Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 200, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974) (conference committee's deletion of phrase from bill "strongly militates against a judgment that Congress intended a result that it expressly declined to enact").

**9.** This statement was reinserted into the record on September 9, 1959. 105 Cong.Rec. 18,705, *reprinted in* 2 Leg.Hist. 1454. The Secretary also points to an insertion into the Record of an extension of Senator Goldwater's remarks on October 2, 1959, in which Senator Goldwater states that the amended parenthetical in LMRDA § 402(a) authorizes the Secretary to

file a complaint against a union for failure to follow its removal procedures. 105 Cong.Rec. 19,764–65, *reprinted in* 2 Leg.Hist. 1850–51. Both of these statements were inserted into the record after final Senate approval of the Conference Report on September 3, 1959. Congressional statements made after a bill has been passed are considered poor evidence of Congressional intent. *See United Mine Workers v. Federal Mine Safety & Health Review Comm'n,* 671 F.2d 615, 622–23 (D.C.Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 239, 74 L.Ed.2d 189 (1982); *Rogers v. Frito-Lay, Inc.,* 611 F.2d 1074, 1080 (5th Cir.), *cert. denied,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980); *Allyn v. United States,* 461 F.2d 810, 811 (Ct.Cl.1972). We decline to attribute much weight to these post-enactment statements.

**10.** Senator Goldwater was the only senator to vote against S. 1555 when it passed the Senate, 105 Cong.Rec. 6745 (1959), *reprinted in* 2 Leg. Hist. 1257, although he later voted for the Conference Report. A review of the record reveals that Senator Goldwater was critical of S. 1555

First, this analysis, or a similar statement, is notorious by its absence from the Conference Report, which, like the Senate Report on S. 1555, merely reiterates the language of the relevant sections in its section-by-section analysis. *See* H.R.Rep. No. 1147, 86th Cong., 1st Sess. 34–35, *reprinted in* 1959 U.S.Code Cong. & Ad.News 2503, 2506–07, *and* 1 Leg.Hist. 934, 938–39. Second, this statement was merely inserted unspoken into the Record, thus making it unlikely that a senator would be motivated to dispute the staff member's analysis. Third, the statement was placed in the Record more than 4 months after the Senate had sent S. 1555 to the House. Although the Senate had yet to approve the Conference Report as of the date this statement appeared, the Senate debate on the provisions of S. 1555 were essentially concluded. The statement is thus functionally equivalent to a post-enactment statement and, for that reason, possessive of little persuasive force.[11]

Lastly, this statement contradicts previous statements of Senator Goldwater himself. Senator Goldwater was a signatory to the Minority Views of the Senate Report quoted *supra* p. 540. Later, on May 7, 1959, Senator Goldwater had inserted into the Record a staff report which contains this statement: "Most shockingly . . . is what appears to be the failure of the bill [S. 1555] to provide any remedy where the union's constitution or bylaws do contain an adequate removal procedure but the union refuses to apply them." 105 Cong. Rec. 7632, *reprinted in* 2 Leg.Hist. at 1272. On July 24, 1959, in a speech to the National Press Club that was also placed into the Record, Senator Goldwater states, "Under the Senate bill there is some doubt whether there is any provision which permits union members to invoke or enforce the procedures contained in their union's constitution or bylaws for the removal of union officers guilty of serious misconduct." 105 Cong. Rec. 14,203, *reprinted in* 2 Leg.Hist. at 1322.

All these various statements analyzed the identical language.

We conclude from the legislative history of the LMRDA that Congress did not intend to expand the substantive legislation on union removal procedures beyond the limits of § 401. It necessarily follows then that those regulations found in 29 C.F.R. Part 417, Subpart B, that purport to give the Secretary a general authority to intervene in union affairs upon a finding that a union has failed to follow its adequate removal procedures are void for lack of statutory authority.

## C

We should emphasize that our reading of §§ 401(h) and 402(a) does not render § 402(a)'s parenthetical "superfluous, void, contradictory or insignificant." *Rockbridge v. Lincoln,* 449 F.2d 567, 571 (9th Cir.1971). There is in fact one occasion where the Secretary is entitled to ensure that a union follow its removal procedures. This intervention is authorized when a union fails to follow its procedures in a removal vote subsequent to a court order compelling the union to conduct a removal procedure. *See* § 401(h). Of course, the previous court order can only be issued following a finding that the union has inadequate removal procedures, but that finding would not exclude the possibility that a union's procedure for the removal vote itself are adequate. In this narrow set of circumstances, the LMRDA does authorize the Secretary to go to court to compel a union to follow its adequate removal procedures.

## III

We are mindful that the language of a labor statute such as the LMRDA should be read "against the background of its legislative history and in light of the general objectives Congress sought to achieve." *Wirtz v. Bottle Blowers,* 389 U.S. 463, 468,

---

because, in his view, it inadequately regulated union behavior. *See, e.g.,* 105 Cong.Rec. 6742, reprinted in 2 Leg.Hist. 1254 (explanation of vote against S. 1555).

**11.** *See* note 9, *supra.*

88 S.Ct. 643, 646, 19 L.Ed.2d 705 (1968). An examination of the legislative purpose behind the LMRDA generally, and Title IV specifically, confirms our reading of the legislative history.

The primary purpose of the LMRDA was undoubtedly to remedy perceived abuses by labor unions, although it also imposed requirements on employers. However, Congress was very determined not to interfere with union affairs if not absolutely necessary. The Senate Report on S. 1555 lists three guiding principles behind the bill. The first two speak directly to this Congressional concern.[12]

The Supreme Court has recently reemphasized this point, stating:

In drafting Titles II through VI, Congress was guided by the general principle that unions should be left free to "operate their own affairs, as far as possible." S.Rep. No. 1684, 85th Cong., 2d Sess. 4–5 (1958). It believed that only essential standards should be imposed by legislation, and that in establishing those standards, great care should be taken not to undermine union self-government. Given certain minimum standards, "individual members are fully competent to regulate union affairs." Id. Thus, for example, in Title IV, which regulates the conduct of union elections, Congress simply set forth certain minimum standards. So long as unions conform with these standards, they are free "to run their own elections."

United Steelworkers of America v. Sadlowski, 457 U.S. 102, 117, 102 S.Ct. 2339, 2348, 72 L.Ed.2d 707 (1982) (quoting Wirtz v. Bottle Blowers, 389 U.S. at 471, 88 S.Ct. at 648).

■ This counsel of limited government interference in union affairs applies particularly well to the situation now before us. If the Secretary were to make a practice of interfering in union removal proceedings under circumstances similar to those of Local 19, he would run the danger of excessive involvement in union politics. The LMRDA itself provides remedy for union faithlessness to removal procedures in two ways. Section 504, 29 U.S.C. § 504, makes it a criminal violation for a person convicted of a serious offense to hold union office.[13] Lesser offenses justifying removal will eventually be considered by union members during their election of officers, which must occur at least once every 3 years, and which must be conducted in accordance with adequate election procedures. LMRDA § 401(b), (e), 29 U.S.C. § 481(b), (e). This requirement functionally duplicates the requirement of an adequate removal procedure that the membership vote on removal. 29 C.F.R. § 417.2(e)(5).[14] The only advantage the Secretary might claim for a right to intervene where unions fail to follow their removal procedures is that he may be able to secure more expeditious removal through his intervention. But since an adequate union removal procedure may include union appeals, see 29 C.F.R. § 417.2(e)(6), even this advantage may be marginal.

---

12. 1. The committee recognized the desirability of minimum interference by Government in the internal affairs of any private organization. Trade unions have made a commendable effort to correct internal abuses; hence the committee believes that only essential standards should be imposed by legislation. Moreover, in establishing and enforcing statutory standards great care should be taken not to undermine union self-government or weaken unions in their role as collective-bargaining agents.

2. Given the maintenance of minimum democratic safeguards and detailed essential information about the union, the individual members are fully competent to regulate union affairs. The committee strongly opposes any attempt to prescribe detailed procedures and standards for the conduct of union busi-

ness. Such paternalistic regulation would weaken rather than strengthen the labor movement; it would cross over into the area of trade union licensing and destroy union independence.

S.Rep. 187 at 7; 1959 U.S.Code Cong. & Ad. News at 2323; 1 Leg.Hist. at 403.

13. Although § 504 does not allow a court to enjoin such a person from holding union office, see United States v. Jalas, 409 F.2d 358 (7th Cir.1969), the criminal penalties applicable to one who would violate § 504 are a strong deterrent against office-holding by a person deemed ineligible by this section.

14. LMRDA § 401(i), 29 U.S.C. § 481(i), authorizes the Secretary to issue standards for determining the adequacy of union procedures.

In sum, we are sympathetic with the Secretary's motives but cannot agree that Congress has authorized his actions. "[W]e must take care not to extend the scope of the statute beyond the point where Congress would stop." *62 Cases of Jam v. United States,* 340 U.S. 593, 600, 71 S.Ct. 515, 520, 95 L.Ed. 566 (1951).

REVERSED.[15]

---

15. Local 19 has requested an award of attorney's fees against the Secretary. Although some courts have allowed attorney's fees to be granted to union members who intervene in Title IV actions against local unions, these fees are awarded against the union, and not the Secretary, on the ground that the members' intervention has provided a "common benefit" to the union. *See Brennan v. United Steelworkers of America,* 554 F.2d 586 (3d Cir. 1977), *cert. denied,* 435 U.S. 977, 98 S.Ct. 1627, 56 L.Ed.2d 71 (1978); *Usery v. Local Union No. 639 International Bhd. of Teamsters,* 543 F.2d 369, 381–88 (D.C.Cir.1976), *cert. denied,* 429 U.S. 1123, 97 S.Ct. 1159, 51 L.Ed.2d 573 (1977); *cf. Ross v. International Bhd. of Elec. Workers,* 544 F.2d 1022 (9th Cir.1976). We find no authority for an award of attorney's fees against the Secretary in either Title IV or the cases interpreting Title IV. Accordingly, the request for attorney's fees is denied.

